W. L. VANCE AND WIFE *v*. M. VANCE AND WIFE.

**Wills — Proposal — Binding Contract — Specific Execution.**

To make a proposition by a father to devise certain land to a daughter, upon acceptance or approval, legally binding, it is necessary that such purpose or intention should clearly appear, and the instrument admit of no other construction.

**Same.**

The proposition to thus devise his estate carries with it the legal intendment that the will when made is revocable, and even though called a will, yet an instrument made in conformity to a pre-existing contract, valid and binding, would not in fact be a will, but itself a contract binding on both parties.

**Same.**

To make a contract out of a proposed devise of an estate the proposition should have shown clearly that the father understood that he was disposing of the portion of his estate therein embraced by contract, and not by will.

APPEAL FROM BOYLE CIRCUIT COURT.

June 21, 1866.

OPINION OF THE COURT BY JUDGE PETERS:

In 1849 the appellees, Morgan Vance and Susan P., his wife, resided on the Mississippi river, below the city of Memphis, in Tennessee, and her father, George C. Thompson, then resided on a large and very valuable estate in Mercer county, Kentucky.

He was far advanced in years, in feeble health, and as he expressed himself, expected " to live but a short time."

Thus situated, and thus impressed, Thompson desired that his daughter, Mrs. Susan P. Vance, for whom he then entertained the tenderest parental affection, should, with her husband, remove from Tennessee and settle on the Ray farm, as it is called, near him, or reside with him; and during the year 1849, wrote them a letter, inviting them to come to his house, and make preparations for a permanent home in Kentucky.

On the 10th of October of that year, M. Vance and wife were

at her father's, and while in his house, she addressed him a letter, substantially as follows:

"The short conversation we had has led me to think over carefully and calmly as I can, the proposal made to Morgan and me, to live with you during your life, or so long as I could be of any service or comfort to you, arranging our plans to make our home in this country, and with the design of purchasing out the other heirs of this place, whenever it may be for sale, which you secure the chance of, by arrangements in your will, and will clearly and *unreservedly* tell you my feelings about it. We came here to see you, and to see if we could do anything now or hereafter to add to your pleasure or comfort without any connection in any way with your business or property, it having been always my earnest desire, that my husband should have no business intercourse with my family, and this has deepened by all that had taken place.

"So far as my presence, or carrying out the warmest desire of my life, to make your happiness, by all in my power, is connected, there is no hesitation for a second, for *Morgan* or myself. Simple duty, even without the feeling I have for you, teaches us both, that while you need us, there can be no other claim so strong. To do this, of course, must be giving up all plans for a home of our own for the time, and, consequently, it would be greatly to our pecuniary advantage, in every way, and very much to our pleasure, if it were settled, that our home for life was to be here, or near here, so as to enable Morgan to dispose of all his property, and invest his means here; besides the unspeakable comfort of thus removing the necessity of his leaving us and of our moving about again.

"All this would make your proposal to live here, with the determination to improve our Ray place, which we could do immediately as our home, or for a child — if it should happen that this place would be for sale, or rent sooner than I suppose, agreeable to me in a high degree, and to *Morgan,* except (I must speak plainly) for the startling and painful lesson taught in the feelings

of misunderstandings springing from the prospect of our living near you, and the mortifying position we have been placed in before the world, as seeking your property at the disadvantage of my sisters, and living in your house to intrigue for such objects (false and unjust as these aspersions are), and that they are entertained and publicly charged upon us, we cannot doubt, since they have been so personally in the most insulting way. I should not regard this for myself, but it renders the prospect before Morgan one painful to a proud man, and unendurable I fear. If there was the seeming causes for complaint, so easily found out of such an arrangement as this, however just it be, as between all concerned in it. While you live these things would be but talk, deeply wounding to us, but easily refuted when tried by your word; but when you are no more, who will be just enough to believe Morgan and I innocent, when charged with coming here to live with my father during his last years, to stand between him and his children, and cajole or wring from his feebleness, money or some greater share of his property? *Nobody.* You know this *pa.* My own mother would not; and the fact that you arrange for us to get your home would be made a proof of all that bad feeling would say. And so much is said to nourish such dissensions in families, and I have no hope of regaining what I have so strangely, to me, lost, of family affection. I dread more than death such trials of feeling and temper, and shrink from doing anything to bring me into a dispute about a father's property, or a discussion about how or why it was given by him to me, or any other of his children. If you wish me to remain with you, I will do it, and with Morgan's cordial consent, as children guests, totally unconnected with any property arrangements, or inducements, or I will ask him to resolve on making our home on our place — sell out and settle here for life, prepared to purchase the old homestead at any hour it may be for sale, and do all I can to carry out your wishes on one condition, which is, that you will write for me a simple statement of your invitation and promise of the refusal in the sale

of this place, being unsolicited, and unsuggested by either Morgan or myself, and that we were not advised of it till after we had come here to see you by your request. This is true, and though the arrangement is perfectly fair to all who are concerned I wish it for two reasons:

" That it will be proof after your death, and after mine, for my children, that I never asked or sought from you, fairly or unfairly, to any human, any sort of property.

" And in the second place, that if unhappily any dif-ficulty should ever arise between any of the parties in such an arrangement, there would be a statement of the only one who has a right to *propose* of the *whole*. This is to avoid any claim of misunderstanding between any of us — *you,* ma, Morgan, and myself. And is the best safeguard; for all would never say we were deceived as to any part of our mutual promises — which chance is far more to me than not seeing for years my father and mother. I ask nothing, and only say what are the rea-sons which make me hesitate to do anything you wish, and how that hesitation would be removed; and I, enabled with a heart and mind free of care, or dread of misapprehension from any, to live here, the only place which will be home to me while you live, and to look forward to bringing up my children to enjoy and love it as I have done. If you, for reasons unknown to me, decline my wish, I can but say or do what I wished in coming here — only let us be of some comfort to you while you live, and let property alone, so far as I am concerned."

To which her father on the same day made the following re-sponse:

" My dear daughter — My advanced age and the state of my health admonish me, and must render it evident to others that my life can be protracted but a few months longer. And, at its termination, I fear my family, like most families, similarly situated, will get to quarreling about my property, and deal in criminations and re-criminations in regard to my disposition of it by my will. To obviate this, as far as I can, I have concluded to leave some explanation on paper of my views, and the reasons

which influenced me, especially as to what I have done, and what I propose to do for you and your husband, as I think you entertain some not unreasonable apprehensions that the provisions which I expect to leave in my will, in regard to you, may attract particular animadversions, and you be charged with using improper means to influence me, when in fact there is not the least ground in the world for such an imputation, as will appear by the following statement:

"My father left me this home place on this side of the creek, with a limited title, but with the right to leave it to my widow as a residence. I have always so left — in my will. Reflecting upon what would be her loneliness here, after my death, if both her children continued to live at a distance from her, I was anxious that Mr. Vance should purchase the Ray place, and when, at my earnest request, he did so, I added to it of my own free will, some hundred and odd acres. Nobody used any influence with me. None was necessary, for I was more anxious than any other person about it, in hopes you would some day live there near us, or near your mother. Recently, that is, last winter, or spring, my health becoming very bad, and the loneliness of just us two old people by ourselves, in this large house, almost intolerable, I wrote to you, and earnestly requested that you and Mr. Vance would come and live with us as children during the short remainder of my life; and you could help your mother nurse and attend to me.

"I had proposed to William Vance and Letitia some years ago, to live with us, she being our youngest child; but they are now so located in Woodford that their coming is out of the question. It struck me when I wrote to you that as you had left *Nonconna*, on account of the cholera, and probably might not feel inclined to make that a home again, it might suit you very well to live with us. And Mr. Vance could be making improvements on the *Ray place* and still keep up his plantation at *Nonconna*. *Well*, you are with us; induced to come and I hope to remain, as you say, and I have no doubt of it, merely by your affection for us, and a sense of

duty to an infirm old father. It is my earnest desire that you establish a permanent home up here. The *Ray* place is too small. A plan has occurred to me some weeks ago and, upon mature reflection, I have made up my mind, decidedly, in favor of it. I have intimated it to Mr. Vance and yourself, and now put it on paper and offer it for your approval, in hopes you will accede to it, and I shall have one of my children to nurse me and keep me company for the short time I have to live. You are willing to do anything I could claim from your duty and affection, but shrink from any arrangement which would be calculated to hurt the feelings or injuriously affect the interest of your sisters.

" I think I can show you that the plan I contemplate will do neither. It is this: My widow, as I have mentioned, is to have this place, some 500 and odd acres, as a home; at the expiration of her possession of it by death, marriage, or voluntary relinquishment it is, according to my will, as it now stands, to belong to you and Letitia. Mary, for a reason named in the will (her having no family), is excluded from any share in it; of this exclusion I will speak again presently. Letitia then is the only one interested or has a right to say a word concerning what I am about to do — which is to change my will so as to provide that when this place shall fall to you two, instead of dividing the land, it shall be valued by commissioners appointed by court, and you have the option to take it all, paying to Letitia for her part according to valuation, or if you decline, then she may have the same option to buy yours. Letitia cannot complain of this, for her half of the land, were it divided, would not do for a home for her. It would have to be sold, and would not be very salable, either; for splitting it would destroy the beauty and value of the improvements in a great measure, whereas, by my arrangement, she would find a bargain ready made to receive full value. By the way, Letitia's share would be some $5,700 more than yours, because I have already given you in advancement some of the same tract worth that much, leaving the part subject to division, as I

have before said, 500 and odd acres. The land over
the creek will be immediately divided after my death
between my three daughters. I have advanced you these
forty acres. I shall direct that the commissioners shall
charge you with what they think that is worth and lay
off your share adjoining the forty acres. This would
make an addition to the Ray tract at my death, and
then, when this home place is either divided or bought,
the whole affair would be a superb establishment and
one of the strong desires of my heart be gratified, I
hope, which is, that the old homestead should not pass
to a stranger, but belong to one of the grandchildren
of my honored old father, whose industry acquired it,
being likewise the child of my wife, who has worked so
hard to improve it.

"Now what right has any one to complain of this
arrangement. Mary is to have no interest in the place,
whether this arrangement is made or not. I said I
would advert again to her exclusion of this interest.
More than a year ago I reflected about this matter. I
consulted Major Taylor upon the abstract point of mak-
ing a more ample provision for a daughter with children
than for one without the prospect of any. He concurred
with me on the subject, and without saying a word to
any other person, I sat down and wrote my will on the
12th October, 1848, as I see by its date, making this
exclusion. Since that I have indirectly drawn out the
opinion of divers persons upon the abstract question
and have found not one dissenting. Let not Mary think,
or the fools who are so fond of taking an interest in
other people's business say, that Mary's stepmother had
any hand in this. I declare before Heaven that she
had nothing to do with it. I never named it to her
nor she to me, and I am sure she never had an idea
that I had done it for months afterward, and as well as
I can recollect, not until you have been here a month
or two since, when I mentioned it in connection with
my plan for your getting the place. I believe I have
said enough to make you understand my views and my
proposition to you. It is made after the most mature

reflection and deliberation, and as soon as you express your approval I will incorporate it in my will. I need not remind you that events might happen (exceedingly improbable, to be sure) to make it necessary to change it. For instance, the death of my wife before mine; this would require a reconstruction of my will; the death of yourself and your children, or your death and Mr. Vance's marriage again; or a rupture and a separation between my wife and myself (though I think as the old lady and myself have stuck together for more than thirty years, we will hardly be sundered within the short remainder of our joint lives), or what is about as improbable, conduct on the part of any of my children, which would make disinheritance indispensable, etc. But I have no idea that anything will happen to alter the arrangement. My heart is in its effectuation.

"It is doing no injustice to my other children, nor need any person say that it is in the nature of a cold bargain, and that I am buying your kind and affectionate attentions to my infirm health. No, these are unbought, and felt by me as the free and voluntary offerings of the heart of a beloved and dutiful child.

"P. S.— I forgot to mention another contingency which would make it necessary to change my will — that is, Mary Rebecca's becoming a breeding woman. But in making any alterations, I would still have in view, as far as practicable, your getting this place as a residence."

The father survived over six years after this correspondence, which is copied entire, that the full object and effect of the communication made by George C. Thompson should be presented.

On the 8th of February, 1885, he made and published his last will and testament, which was admitted to record by the Mercer County Court at its March term, 1856, by which he devised the balance of his *Shawnee Springs tract* of land, except the part he had theretofore given to his daughter Susan, in fee simple to his daughter Letitia and her heirs and assigns. And then added: "To my daughter Susan, I have heretofore given a good deal; I give her no more."

After the probate of the will the appellees, Morgan Vance and wife, claiming that the letter of the 10th of October, written to Mrs. Susan Vance by her father, and already recited, constituted a binding contract for a valuable consideration, and fully accepted by them, filed their petition in equity against William L. Vance and wife and others, praying for a specific execution and for other relief, and judgment having been rendered in their favor by the court below, William L. Vance and wife, by this appeal, seek to reverse that judgment.

The first and most important question presented by this record is, does the letter of George C. Thompson of the *10th of October, 1849*, evidence a valid, binding contract on him upon its accept-ance by appellees?

After a careful examination and consideration of that docu-ment a majority of the court is satisfied that George C. Thomp-son did not intend, and did not, in fact, thereby place himself under a legal obligation to devise the estate referred to to his daughter, Mrs. Susan P. Vance. He certainly desired his said daughter to reside with him, or on her husband's farm near to him, and said letter contained a proposition to her to do so.

Willing, as she expressed herself, to gratify her father's wishes in this respect, but if she did she feared that her sisters would impute to her the unworthy purpose of exercising an undue and improper influence over him in the disposition of his estate to her advantage.

This letter was then written at her request to be used by her, if it should ever become necessary, in explanation of the proposed disposition of his estate, to satisfy her sisters that she was blame-less in the business, and to shield her from any and all assaults that might be made upon her in reference thereto.

And this is made still more apparent from the letter she ad-dressed to him, in which she urges him to it, for her justification when he shall be *no more*, and to remove every pretext for any disturbance of the harmony which should exist between herself and her sisters.

Moreover, after having stated to his daughter his proposed plan of disposing of his homestead, urging her to approve it, ex-pressing his determination to make his will conform to his proposi-tion, so soon as she expressed her willingness to accept it, he assures her it could not wound the feelings of her sisters or

seriously affect their interests, and reminds her that she had said the inducement to her to reside with, or near him, was *merely her affection and sense of duty to an infirm old father.* And in responding to that sentiment of affection and duty he, in the last sentences of his letter, before the *postscript,* says:

> "It is doing no injustice to my other children, nor need any person say that it is in the nature of a *cold bargain,* and that I am *buying your kind and effectionate attentions* to my infirm health. *No; these are unbought, and felt by me as the free and voluntary offering of the heart of a beloved and dutiful child.*"

If it was the avowed purpose of an individual to repel the conclusion that an instrument was not intended to be a binding, valid contract, it would be difficult to find terms better suited to the purpose.

But to make a proposition of this character, upon its acceptance or approval, legally binding, it is necessary that such purpose or intention should clearly appear, and the instrument admit of no other construction.

The proposition thus to devise his estate carries with it the legal intendment, that the will when made is revocable, and even though called a will, yet an instrument made in conformity to a pre-existing contract, valid and binding, would not be in fact a will, but itself a contract binding upon both parties.

To make a contract out of a proposed devise of an estate, this letter should have shown clearly that George C. Thompson understood that he was disposing of the portion of his estate, therein embraced by contract, and not by will.

We can see nothing in this letter evidencing an intention on his part to bind himself to give his estate to his daughter, as suggested; and we cannot come to the conclusion that he intended to place it in the power of his daughter and her husband, or either of them, to compel a specific execution.

But even if we should be mistaken in our conclusion as to the character of this letter, still we cannot doubt that George C. Thompson expressly reserved the power after having made a will conforming to what he therein proposed, to change or revoke the same, and deprive Mrs. Susan Vance of all benefits from his estate, upon the happening of events that might render it proper,

and of which he to a very great extent must necessarily have been the judge.

It is the opinion of a majority of the court, Judge Williams dissenting, that the judgment of the court below be reversed, and the cause remanded, with directions that the petition be dismissed, with costs.